FILED

01/24/2017

Clerk of the
Appellate Courts



IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2016

IN RE A.B.,[1] ET AL.

Appeal from the Chancery Court for Maury County
No. A-049-14        Robert L. Jones, Judge

_____

No. M2016-01286-COA-R3-PT
_____

Father and stepmother petitioned to terminate the parental rights of mother to her two children. We have determined that the petitioners proved by clear and convincing evidence that mother's actions prior to her incarceration exhibited wanton disregard for the welfare of the children and that it is in the best interest of the children for mother's parental rights to be terminated.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Kori Bledsoe Jones, Columbia, Tennessee, for the appellant, Ashley M.H.

Ronald G. Freemon, Columbia, Tennessee, for the appellees, R.D.B. and Amy E.B.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

R.D.B. ("Father") and Ashley M.H. ("Mother") are the biological parents of A.B. and R.B. ("the children"). Father is now married to Amy E.B. ("Stepmother"). In December 2014, Father and Stepmother ("the petitioners") filed a petition to terminate the parental rights of Mother ("the respondent") and for the adoption of the children by Stepmother in the Maury County chancery court.[2] According to the petition, the children

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] Pursuant to Tenn. Code Ann. § 36-1-113(b), Father has no standing to petition for the termination of Mother's parental rights; however, he is a necessary party to Stepmother's petition for

had been in Father's custody since February 2013 pursuant to an order of the Maury County juvenile court, and Mother was currently incarcerated in the Maury County jail. The trial court appointed a guardian ad litem ("GAL") to represent the interests of the children in January 2015.

Father and Stepmother were permitted to file an amended petition to terminate in March 2015 and to add the ground for termination at issue in this appeal. They alleged that Mother had abandoned the children by engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the children. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). The case was heard on May 4 and 5, 2016. The sole basis for termination argued at trial was abandonment by wanton disregard.

Evidence at the Hearing

The petitioners' first witness was Mother. She testified that she and Father were in a relationship, off and on, from 2007 until 2012, during which time the two children were born (in July 2008 and March 2011). By May 2012, when the relationship had ended, Mother and Father alternated custody on a week-on/week-off basis.

Mother acknowledged that, in January 2010, she pled guilty in general sessions court to theft of merchandise in Walmart; she was placed on probation and told to stay out of the store. A few months later, she was charged in circuit court with possession of scheduled drugs for resale and was sentenced to three years' probation at thirty percent. In December 2011, Mother was charged with a first offense DUI, to which she pled guilty; that charge was tied in with her other charges to run concurrently with her three-year sentence. As a result of the DUI offense, Mother received a forty-five-day sentence for violation of probation, and she was only required to serve half of that sentence. Mother testified that, while she was incarcerated, the children stayed with her parents and with Father's parents because he was also incarcerated at that time.

In late November 2012, Mother called Father in the middle of the night saying that she had been threatened by someone and that he needed to keep the children. She left Columbia, Tennessee on December 5 and went to Memphis. Mother testified that her reason for going to Memphis was that, beginning in October 2012, she had gotten involved with a man named Glenn Miller and that "he had did something and I was in fear." Their relationship ended on December 12, 2012, when Mother went to jail in Davidson County, Tennessee, charged with felony possession of a firearm, driving on a

---

adoption. *See* Tenn. Code Ann. § 36-1-115(c) (noting that the spouse of the petitioner seeking to adopt a child must sign the adoption petition as a co-petitioner even when the spouse is the biological parent of the child sought to be adopted); *Osborn v. Marr,* 127 S.W.3d 737, 740-41 (Tenn. 2004) (explaining that a parent of a child is not one of the persons or entities with standing to file a petition to terminate parental rights).

suspended license, and alteration of a serial number. Mother was erroneously released from jail in Davidson County in July 2013; she was still supposed to be incarcerated in Maury County on violations of probation. Mother turned herself in in Maury County in August 2013 and was incarcerated there until December 4, 2014.

Mother admitted to having a history of drug abuse, including the use of drugs (marijuana, cocaine, opiates, and Xanax) since her release from jail in 2014. She testified that, at the time of the hearing, it had been a month since she had used drugs. Mother admitted that, when she took a drug screen after the filing of the petition, she failed for marijuana.

Mother testified about her involvement with Mr. Miller. Shortly after their relationship began, Mother realized that he was in a gang and was engaged in some activity that scared her. Mr. Miller had a gun that did not belong to him. The two of them went to Memphis for a few days because they were being threatened. On the way back to Nashville, they were pulled over by the police. The gun was in the car. Mother further testified:

> Q. Can you tell me what happened when you were pulled over on your way back from Memphis?
> A. When we got pulled over, the cop asked what our names was and ran his name and it came back that he had a warrant down here so they automatically handcuffed him, and me being scared, being my car, the gun was in my car, I just—I kind of panicked and I put it on my person.
> Q. Put what on your person?
> A. The gun.
> Q. Was the gun yours?
> A. No.
> Q. Why did you put it on your person?
> A. Because at that time, I didn't think that—I didn't think that I was going to get in any kind of trouble at all. I really wasn't thinking at all.
> Q. So were you trying to keep yourself out of trouble.
> A. Yes. Yes.
> Q. Do you see in retrospect that was a bad idea?
> A. Yes.
> Q. Did the officer ask you or tell you he was going to search?
> A. Yes. He told me he was going to search and did I have anything on me or in my car that he needed to know about.
> Q. And what did you do at that time?
> A. I told him yes, and he asked me what it was, and I told him, and he asked where it was, and I showed him, and he took it off my person.

Q. Okay. And you were eventually—you were charged with felony possession of that firearm?
A. Yes.

Asked about her pre-incarceration drug use, Mother testified that she did not use drugs in the presence of her children. At that time, she was using marijuana and Xanax (which had been prescribed to her for anxiety), but not every day. Mother stated that Father used Ecstasy, marijuana, and opiates. Mother acknowledged that she had not been completely clean since her incarceration, but she used drugs "in spurts." For the first five months after her release, she did not use any drugs. She attributed her inability to stay clean largely to the fact that she had not been allowed to see her children or talk to them on the phone. Mother testified that she went to rehabilitation voluntarily after her DUI because she realized she was drinking too much, and she completed the program.

Mother had worked at McDonalds off and on for thirteen years for the same employer, Tony Wolfe. She received raises and promotions. Since her release from incarceration in 2014, Mother worked at McDonalds for fifteen months.

When questioned by the GAL, Mother described the parenting arrangements when the younger child was little and the parents were not together. Mother would have the child the majority of the time, and Father would take her during the weekends and sometimes during the week. The week-on/week-off schedule was established around October 2011 at Mother's request and by agreement of the parties.[3]

While Mother was incarcerated in Maury County, she requested visitation with the children and the court ordered visitation. Mother voluntarily surrendered the visitation after Stepmother informed her that the visits were having a detrimental effect on the children. Mother stated: "it was hard [to give up the visits], it was very, very hard, but I didn't want to be selfish."

Mother testified that she believed she could stay off of drugs without going to rehab. If, however, the court ordered her to complete rehabilitation as a condition to having visitation with the children, she would comply.

Mother testified that, since she had been released from jail, she had been making child support payments. On some occasions, she had not been able to pay the entire amount, but she had made payments every month.

The petitioners next called Father as a witness. Father testified that the children had been living with him for the past four years. He stated that he was incarcerated for

---

[3] Mary Walker, a character witness for Mother, corroborated Mother's testimony that she initiated the 50-50 custody arrangement.

ten days for driving on a suspended license at the same time that Mother was in jail on her probation violation. He had been in jail about a year before that, in June or July of 2011, for driving on a suspended license. In January 2012, he pled guilty to personal use of cocaine and was sentenced to eleven months and twenty-nine days on probation.

According to Father, when Mother called at 2:00 or 3:00 a.m. one night in November 2012, she said her house had been broken into and it was not safe for the children to be there with her. Mother did not come to pick them up the next day, as contemplated under the regular schedule. Father had the children in his custody from that time until the hearing.

Father testified that he learned that Mother was incarcerated in Davidson County when he received a letter from her. Mother "wanted us to write her about the girls and how they were doing."

Asked if he had ever seen Mother in an impaired state while driving, Father testified that, sometime in early 2012, he met Mother to pick up the children from her and noticed that her eyes were bloodshot as if she had been smoking marijuana. He saw a pill bottle on the front seat of her car that looked like her Xanax bottle. She seemed a little shaky, like she was when she was anxious.

The same day that he received the November 2012 call from Mother, Father went to Columbia and met with the Department of Children's Services, which filed a petition for dependency and neglect. Father was given custody of the children in February 2013.

On cross-examination, Father admitted that he had used drugs in the past, including Ecstasy, marijuana, and Lortab. Although he pled guilty to possession of cocaine, he denied taking cocaine. Father stated that he had sold marijuana, but not since the children were born. He had taken marijuana during the life of his older child, but not since the younger child was born. Father further testified that he had been incarcerated three times, twice since one or both of the children were born.

Father asserted that it was his idea that he and Mother enter into the agreement for 50-50 parenting time in October 2011. Father acknowledged that he took no action to obtain full custody of the children after he allegedly saw Mother in May 2012 in an impaired stated when she transferred the children to him. When asked why he thought Mother's parental rights should be terminated, Father answered:

> I believe . . . , as a mother, . . . you would not take the side of a man over your children because he is in trouble, you would let him go and be with your kids. You wouldn't follow him knowing that he is unsafe around you and your child so you choose to drop your child off and go with him. You basically chose a man over your children. So if that's the case, you should

not be with your children. . . . [Y]ou have to think about your children before you think about yourself. . . . She can -- she cannot stay off the drugs, she does not have a stable place to stay, she has been staying here and there, she – the crowd she hangs around is nothing but drug addicts, which, granted, I half of the people I be with, they smoke weed, but that is not allowed at my house.

Stepmother was the next witness for the petitioners. She testified that she and Father met in May 2012, moved in together in August 2012, and married in December 2012. Stepmother stated that, when Mother called saying that Father needed to keep the children, he put the call on speaker phone. Stepmother thought that Mother sounded upset, rattled, and scared. Mother said that she needed Father and Stepmother to take care of the children because they were not safe with her and she was not able to take care of them. Stepmother testified that Mother mentioned that she had gotten into some trouble and that someone was after her.

Stepmother testified that she learned of Mother's incarceration through a letter from Mother. Mother would write letters to Stepmother and the children, and Stepmother would write back. Questioned about why she would write to Mother about the children, Stepmother stated: "I'm a mom so I could see where she would, you know, want to know."

On cross-examination, Stepmother was questioned about the content of the letters she wrote to Mother. Stepmother read into evidence the following excerpts from a letter she wrote to Mother on January 14, 2013:

[From A.B.] Dear Mommy, I have been making snow at school, I have been learning about my letters. I want you to be happy and pretty. I have been talking to Pawpaw [H.] almost every day, I know how you feel. Please don't be sad. I love you very much. I got a motorbike, dirt bike, and baby – a baby, clothes for dress-up. Hi, mom, I love you. [R.B.] says she loves you.

[From Stepmother] You can write the girls any time you like and we will read the letters to them and I will help them write back to you. I did want you to know that we are claiming [A.B.]. . . . I hope you keep your head up and that this may be the start for you to have a major change for a better life for you and these girls who need their mom. I want you to know I will never take your place but I do love and care for these girls with my whole heart. Here's our address if you choose to write the girls.

In a letter dated November 4, 2013, Stepmother informed Mother that the girls "are not adjusting well to the visits." Stepmother told Mother that A.B. was getting in trouble in

school and R.B. was regressing in toilet training. A.B. had allegedly asked a lot of questions about the jail and stated that she did not want to go back and see Mother until she could hug her.

Stepmother was also asked to read excerpts from a letter to Mother dated October 5, 2014:

> I know your time there is coming to an end and I pray daily that you take these last few months and think of what your plans are with these precious girls and what's best for them, not you, me, or R.B. Just like you, we love those girls and have cared for them, giving them such great stability and spoiling them as only kids should be spoiled, not just with toys, but love, comfort, and peace of mind. These girls have grown so much and are happy and I want it to stay that way forever. They deserve a better chance to succeed in life and the way they are going to get that is through stability. I want you to think long and hard how we are going to get along when you do get out. It is important for the girls to see that. It is important that we both stay in the mom role for the girls, they know you are their real mother but I, too, am their mother. Even though I didn't give birth to them, I have given them and will also give them the love and comfort they deserve. I am very worried about you. Life is very different out here than in there. You have to change your friends, your lifestyle, addiction is an everyday challenge. You must stay strong and so these girls know what life should really be like, not staying wherever you can lay your head or getting high instead of paying the light bill. Ashley, I worry about your choices that might put these girls in danger because we know that you have not always made good choices when it comes to what is best for the girls. I know you don't believe me, but I want nothing but good things for you, but I also want us to work together when it comes to raising the girls from here on out. I have just seen it with my kids, how important having that is for them and in how not having that can affect a child in everyday life.

Stepmother acknowledged that, despite discussing co-parenting with Mother as late as October 2014, the petitioners served Mother with the termination petition on December 4, 2014, the day she was released from incarceration. She agreed that Mother acted selflessly in stopping visitation based on Stepmother's assertions that the visits were having a negative effect on the children.

Asked why Mother's parental rights should be terminated, Stepmother described her bond with the children.

After the petitioners rested their case, the GAL filed a motion to dismiss, arguing that the petitioners had failed to prove by clear and convincing evidence that Mother's

actions, prior to her incarceration, exhibited a wanton disregard for the welfare of the children. The court took the motion under advisement, and the hearing continued.

Respondent, Mother, testified on her own behalf. She described her relationship with the children when they were young and stated that, once she and Father were no longer together, it became increasingly difficult to get him to help with the children. She filed to get the order for 50-50 parenting time. Mother discussed the things she did during her incarceration to better herself, including getting her GED and taking a parenting class.

Mother described the visitation with the children while she was incarcerated. She stated that A.B. would talk about school, sing her ABCs, and count to one hundred. The child would tell Mother about things they did at home, like making a gingerbread house and helping Stepmother. Mother stated that, after she learned that the children were experiencing negative effects as a result of the visits to the jail, she wrote the court and asked that the visits be discontinued because she did not want the children to have to go through that. After the court discontinued the visits, Stepmother voluntarily brought the children for a visit in July 2014.

Decision of Trial Court

The trial court took the case under advisement and entered a final judgment on May 20, 2016 in which it concluded that the petitioners had "carried their burden of establishing by clear and convincing evidence that the Respondent's parental rights to both children should be terminated and that the stepmother should be allowed to adopt both children."

Issues on Appeal

On appeal, Mother asserts that the trial court erred in determining that the petitioners proved, by clear and convincing evidence, that her activity prior to her incarceration in December 2012 exhibited a wanton disregard for the welfare of the children. Mother further argues that the trial court erred in concluding that termination of her parental rights is in the best interest of the children.

STANDARD OF REVIEW

The standard for appellate review of parental termination cases was recently reiterated by the Tennessee Supreme Court:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in

termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

ANALYSIS

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with parental rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In the Matter of Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for

termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

(1)

The only ground for termination at issue in this case is abandonment as defined by the following portion of Tenn. Code Ann. § 36-1-102(1)(A)(iv):

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Unlike the other forms of abandonment included (but not quoted above) in this subsection, abandonment by wanton disregard is not limited to the four months immediately preceding the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871. In fact, "the conduct may occur before the birth of the child whose welfare is thereby put at risk." *In re T.M.H.*, No. M2008-02427-COA-R3-PT, 2009 WL 1871873, at *7 (Tenn. Ct. App. June 29, 2009).

The wanton disregard test for abandonment "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. A parent's incarceration acts as "a triggering mechanism that allows the courts to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

In applying these principles to the facts of this case, we are required to find, by clear and convincing evidence, that Mother's actions prior to her incarceration exhibit a wanton disregard for the welfare of the children. The trial court's findings of fact and conclusions of law include the following:

> In January 2010, the Mother was convicted of shoplifting at Walmart for taking a pregnancy test from the store shelves and using it in the store's restroom. On September 16, 2010, while living with the Father, the Mother sold some of her prescription pills to a person working with law enforcement. She settled her drug sale charge with a guilty plea and a

three-year sentence suspended with probation. On December 29, 2011, she was arrested and charged with a misdemeanor drug violation and a charge of driving under the influence of an intoxicant. In March 2012, she settled those misdemeanor offenses along with the charge of violating her probation by agreeing to a 45-day sentence, which she served in about 22 days.

During the time the Mother was in jail, the children stayed with her parents or the Father's parents, because the Father also spent ten days in jail at approximately the same time for driving while his license was suspended. Both parents had their driver's licenses suspended, because of two motor vehicle accidents when she was driving a vehicle in his name and neither were able to satisfy the resulting civil judgments.

. . . .

The Mother's disregard for the welfare became wanton when she entered into a new relationship with a man named Glen Miller in October 2012. Either the Mother, Mr. Miller, or both apparently angered someone in some way unknown to the Court, because in November the Mother called the Father and said that she was in danger and the children were not safe with her. She delivered the children to the Father for an indefinite period. She got them for a few hours on Thanksgiving and for a few hours in December when the Mother's grandmother died, but otherwise did not see them for a month or so preceding her arrest with Mr. Miller in Davidson County on December 12, 2012.

She and Mr. Miller left Maury County for Memphis on December 5, 2012. She was arrested in Davidson County on December 12, and charged with possession of a gun with an altered serial number, a felon in possession of a firearm, and driving while her license was revoked. She settled those charges with an agreement to serve one year in Davidson County consecutive to her three-year sentence package for which she was on probation in Maury County. While still in Davidson County custody, she was taken to Maury County on June 20, 2013, and settled her probation violation charges with an agreed full revocation for service of the three-year sentence. She still had some weeks to serve in Davidson County and was not released until July 2013. Davidson County made the mistake of not notifying Maury County of her release, and she remained at large until she turned herself in on August 23, 2013, when she was also appearing for a child support enforcement proceeding in Maury County.

From August 23, 2013, she remained continuously in custody in the Maury County Jail until she finished her three-year sentence on December

4, 2014. On that same day, just hours before her release, she was served with a copy of the complaint and a summons in this civil action by which [the petitioners] seek to terminate her parental rights.

As a result of the gun charges with Mr. Miller in December 2012, she spent over 700 days in jails in Davidson and Maury Counties, a clear majority of her youngest child's life as of the date of this petition on December 4, 2014. It is her conduct while on probation that constitutes clear and convincing evidence of a wanton disregard for the welfare of her children.

The Mother admits that she started using marijuana at age 15 and has over time used cocaine and opiates. She even admits possessing and using marijuana while she was on probation. After this litigation began, the guardian *ad litem* for the children asked the Mother to submit to a drug test, which she failed for the use of marijuana while this termination litigation was pending. At trial, she says she does not need rehab, but would agree to rehab if made a condition for reestablishing a relationship with her children. When asked why she could not stay clean, her excuse was that she was "not able to see or touch my kids."

. . . .

. . . It is undisputed that the Mother had been incarcerated during 23 of the 24 months immediately preceding the institution of this action. Her conduct leading to that incarceration amounted to a wanton disregard for the welfare of the children. Therefore, this Court concludes that her conduct during November and December of 2012 results in the legal conclusion that she abandoned her children, thereby justifying a termination of her parental rights.

While Mother is to be commended for her efforts to provide financial support for the children, her criminal convictions, probation violations, incarceration, and substance abuse have placed her children in danger. Mother's actions show a failure to act in the interest of her children on a consistent basis. This court has stated that "a parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." *State v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) (citing *State v. Harville*, No. E2008-00475-COA-R-3-PT, 2009 WL 961782, at *7 (Tenn. Ct. App. Apr. 9, 2009)). Mother has exercised poor decision making and has committed criminal acts, contrary to the welfare of her children. We have determined that clear and convincing evidence supports the trial court's conclusion that Mother's actions prior to her incarceration exhibit a wanton disregard for the welfare of the children.

(2)

Having determined that clear and convincing evidence exists to terminate Mother's parental rights based on a finding of abandonment by wanton disregard, we next consider whether the trial court properly determined that termination is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although [the petitioners] must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah*, 455 S.W.3d 533, 555 (Tenn. 2015)). The non-exclusive factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interest are set forth in Tenn. Code Ann. § 36-1-113(i):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Every factor need not be applicable for the trial court to determine it is in the best interest of a child for a parent's rights to be terminated. *See In re Audrey S.*, 182 S.W.3d at 878.

The best interest analysis is "a fact-intensive inquiry" requiring the court to consider the unique facts of the case "from the child's, rather than the parent's, perspective." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004)).

In concluding that termination of Mother's rights was in the best interest of the children, the trial court found, in pertinent part:

> The children have not asked about their Mother in more than a year's time, and it would be extremely disruptive to their lives for their Mother at this late date to try to reestablish a relationship.
>
> Even though the Mother has been out of jail since December 4, 2014, and has been employed most of that time, she has not been able to get her driving privileges restored and is sharing a room with her father in a multi-unit half-way house operated by a substance abuse rehabilitation center. It is, therefore, unlikely that the juvenile court would restore any visitation privileges to the Mother in the foreseeable future. This Court recognizes and applauds that the Mother has made employment progress, has eliminated Mr. Miller from her life, and may well be on a path to a better life for herself, but the Court has no confidence in her ability to provide a normal life for these children even with alternative parenting responsibility.
>
> . . . In spite of the Father's admitted shortcomings, his stable relationship with his wife and the children makes it best for the children to become permanent members of their family, without a risk of disruption from [Mother].

The trial court also emphasized the close relationship between the children and Stepmother and Stepmother's stabilizing influence in their lives.

The evidence in the record supports the trial court's findings by a clear and convincing standard. As late as a month before the hearing, Mother continued to use drugs and, even at the hearing, she denied needing rehabilitation services. At the time of the hearing, Mother remained unable to care for the children in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (7). Furthermore, Mother's criminal behavior leading to incarceration made it difficult for her to maintain a meaningful relationship with the children, especially the younger child. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). We affirm the trial court's determination that the termination of Mother's parental rights is in the children's best interests.

## CONCLUSION

The decision of the trial court is affirmed. Costs of appeal are assessed against the appellant, Ashley M.H., and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE